## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| The Hertz Corporation, Herc Rentals Inc. and Royal Caribbean Cruises Ltd., | Case No: |
| Plaintiffs, | |
| v. | |
| Visa U.S.A. Inc., Visa International Service Association, Visa, Inc., MasterCard Incorporated, and MasterCard International Incorporated, | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Hertz Corporation ("Hertz"), Herc Rentals Inc. ("HERC") and Royal Caribbean Cruises Ltd. ("RCL") (collectively "Plaintiffs") bring this civil antitrust action against Defendants Visa U.S.A. Inc., Visa International Service Association, and Visa, Inc. (collectively "Visa"), MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard"), under the antitrust laws of the United States, and as follows:

## TABLE OF CONTENTS

I.  NATURE OF ACTION ................................................................................. 2

II.  PLAINTIFFS ................................................................................................ 6

III.  DEFENDANTS ............................................................................................ 8

IV.  CO-CONSPIRATORS .............................................................................. 10

V.  JURISDICTION ......................................................................................... 12

VI.  VENUE ...................................................................................................... 12

VII.  DEFINITIONS ........................................................................................... 12

VIII.  TRADE AND COMMERCE ....................................................................... 18

IX.      INJURY TO CONSUMER WELFARE, CHOICE AND COMPETITION ................................ 19

X.      RELEVANT MARKET ........................................................................................ 22

XI.     FACTUAL ALLEGATIONS ................................................................................... 29

        COUNT I – Conspiracy in Restraint of Competition Against Visa and Co-conspirators (Regarding Interchange Rates and Merchant Restraints) ........................................... 38

        COUNT II – Conspiracy in Restraint of Competition Against MasterCard and Co-conspirators (Regarding Interchange Rates and Merchant Restraints) ................... 40

        COUNT III – Visa's Monopolization .......................................................... 43

        COUNT IV – MasterCard's Monopolization ................................................. 44

        COUNT V – Attempted Monopolization By Visa .......................................... 45

        COUNT VI – Attempted Monopolization By MasterCard ............................... 47

XII.    PRAYER FOR RELIEF ...................................................................................... 48

XIII.   JURY DEMAND ............................................................................................. 48

## I.    **NATURE OF ACTION**

1.      This is a civil antitrust action challenging two horizontal combinations, conspiracies or agreements.  One unlawful horizontal combination, conspiracy or agreement is among Visa and its co-conspirator financial institution members (or member banks).  A second unlawful horizontal combination, conspiracy or agreement is among MasterCard and its co-conspirator financial institution members (or member banks).  In each conspiracy, Visa and MasterCard and their respective member banks agreed: (1) to fix, set and enforce Interchange Fees (defined below) charged Hertz and RCL prior to Visa and MasterCard's IPOs (described below); and (2) to eliminate the ability of Hertz, HERC and RCL to negotiate lower Interchange Fees and Network Fees (defined below) and restrict competition between the Visa and MasterCard platforms through specific restraints in the Network rules of Visa and MasterCard known as the "No Surcharge" rule (defined below), the "No Discount" rule (defined below), and the "No Discrimination" rule (defined below)

(collectively the "Merchant Restraints").  Each horizontal combination has unreasonably restricted competition in the alleged relevant markets (defined below) and has allowed Visa and MasterCard to extract supracompetitive, artificially inflated Interchange Fees and Network Fees, while also reducing consumer choice, restricting output, raising barriers to entry, and/or decreasing quality. In addition to these illegal horizontal combinations, Visa and MasterCard have each used their monopoly power in the alleged relevant markets to create anticompetitive effects through the imposition of the Merchant Restraints.  The Merchant Restraints have had adverse effects on competition, including: (1) increasing or maintaining prices, including Interchange Rates and Network Fee Rates, at levels that are higher than they would have been in a competitive market; (2) raising or maintaining barriers to the entry or expansion of new or existing market participants; (3) excluding competition for merchants' transaction volume among payment card networks and among issuers within a given payment card network; and/or (4) reducing output and decreasing quality in the relevant market as whole, including as a result of reduced consumer choice.  This monopoly power has enabled both Visa and MasterCard to extract monopoly rents and maintain monopoly power in one or more relevant economic markets.  As described below, Hertz, HERC and RCL seek damages between January 1, 2004 and the present (the "Relevant Time Period" or "Damages Period"), and such other time period as allowed or provided by law.  The allegations in this Complaint of unlawful conduct by Defendants and their co-conspirators pertain to conduct by Defendants and their co-conspirators during the Relevant Time Period.

2.      Some background helps to put this case in context.  Between at least January 1, 2004 and May 22, 2006, MasterCard was a "consortium of competitors," *see United States v. Visa and MasterCard*, 344 F.3d 229, 242 (2d Cir. 2003), comprised of MasterCard and its financial institution members.  During some portion or all of this period, MasterCard was a structural conspiracy in which MasterCard and its financial institution members unlawfully conspired not to

compete by collusively setting, fixing and/or maintaining Interchange Fees and by collusively promulgating, perpetuating and/or enforcing the Merchant Restraints.

3.      Similarly, between at least January 1, 2004 and March 19, 2008, Visa was a "consortium of competitors," *see United States v. Visa and MasterCard*, 344 F.3d 229, 242 (2d Cir. 2003), comprised of Visa and its financial institution members.  During some portion or all of this period, Visa was a structural conspiracy in which Visa and its financial members unlawfully conspired not to compete by collusively setting, fixing or maintaining Interchange Fees and by collusively promulgating, perpetuating and/or enforcing the Merchant Restraints.

4.      On May 22, 2006 and March 19, 2008, MasterCard and Visa, respectively, commenced Initial Public Offerings (IPOs).  Despite and even after those IPOs, however, neither Visa and its co-conspirators nor MasterCard and its co-conspirators ended the conduct which, separate and apart from the setting of Interchange Rates, caused the Visa and MasterCard Interchange Rates to be supracompetitive, namely, the continued maintenance and enforcement of the Visa and MasterCard Merchant Restraints.  Subsequent to May 22, 2006, each MasterCard member bank continued to agree with MasterCard and with each other, and subsequent to March 19, 2008, each Visa member bank continued to agree with Visa and with each other, to perpetuate, maintain and enforce (1) the MasterCard Merchant Restraints and (2) the Visa Merchant Restraints.   The Visa and MasterCard Merchant Restraints, enforced by Visa and MasterCard and their respective co-conspirators, are what enabled and empowered the Visa and MasterCard Defendants to maintain and/or enhance their respective monopoly power.  Visa and MasterCard may have ended their financial institution members' direct participation in the setting of Interchange Rates at some time after January 1, 2004 and before their respective IPOs, and Visa and MasterCard may have removed their financial institution members from the Visa and MasterCard boardrooms with their IPOs, but those actions did not end Visa's and MasterCard's

monopoly power, or each Network's maintenance or enhancement of its monopoly power.  This is because the Visa and MasterCard Merchant Restraints remained agreed to by and among the respective member banks and MasterCard, and the respective member banks and Visa, and those Merchant Restraints continued undisturbed and enforced by Visa and MasterCard and their respective co-conspirators throughout the balance of the Relevant Time Period.

5.     The Merchant Restraints concealed from cardholder consumers the Interchange Fee and Network Fees paid by merchant consumers when cardholder consumers paid with a Visa or MasterCard payment card, and insulated Visa and MasterCard from the horizontal price competition with each other and other payment card networks which would take place in the absence of the Merchant Restraints.  The Merchant Restraints did this by prohibiting merchant consumers, including Hertz, HERC and RCL, from charging differential prices to their customers based on the costs associated with purchasing different forms of payment services, such as offering a lower price (*i.e.*, a "discount") to cardholders who paid with a lower cost payment means; or charging a higher price (*i.e.*, a "surcharge") to cardholders who paid with a higher cost payment means (such as a high rewards credit card).  In a competitive payments environment – which did not exist during the Relevant Time Period due to the anticompetitive conduct alleged in this Complaint – Visa and MasterCard would have lowered their respective Interchange Rates and Network Fees to avoid losing credit card volume to a lower cost payment means.  This would occur because, in the absence of the Merchant Restraints, Visa and MasterCard would lose credit card volume to a rival's credit card or other payment means as cardholder consumers switched to a lower-priced payment means either in response to merchants' surcharging higher-cost Visa and MasterCard Credit Cards (defined below) or merchants discounting lower-cost payment means.  This same competitive dynamic would have occurred among Visa and MasterCard Issuing Banks (defined below) as merchants would have had the freedom to surcharge an individual Issuing

Bank's high-interchange Credit Card products or offer discounts to steer customers to those Issuing Banks' Credit Card products that were less costly for the merchant consumers to purchase. The Merchant Restraints thus interfere with the most basic form of price signaling and commercial speech – merchants' use of price to communicate with their customers about the customers' payment choices.  The intended result and effect of the Merchant Restraints is to eliminate all horizontal price competition between MasterCard, Visa, and other payment forms, and also between their respective member banks who issue MasterCard and/or Visa payment cards.

6.      If the Visa and MasterCard Merchant Restraints were eliminated, merchants would be able to surcharge or discount Credit Cards at the brand name (*e.g.*, Visa, MasterCard), Issuing Bank (*e.g.*, Chase or Bank of America), and product (*e.g.*, consumer card, commercial card, rewards card, etc.) level.  This reform would enable merchants to expose the hidden Interchange Fee (and other Network Fees) to their customers; educate customers about those fees; use that information to influence their customers' choices of payment methods; and stimulate horizontal price competition among Visa, MasterCard and other payment forms and also among the card Issuing Bank members of both MasterCard and Visa.  Removing the Visa and MasterCard Merchant Restraints is pro-competitive because it provides merchants, including Hertz, HERC and RCL, with the opportunity at the point of sale to stimulate the sort of Network and Issuing Bank price competition that can and will exert downward pressure on price, including Interchange Rates and Network Fees.

## II.      **PLAINTIFFS**

7.      Plaintiff The Hertz Corporation ("Hertz") is a Delaware corporation with its principal place of business in Estero, Florida.  It is engaged in the business of vehicle rental and leasing through its Hertz, Dollar and Thrifty brands.  It does business throughout the United States.  From a point in time prior to January 1, 2004 through June 30, 2016, Hertz owned Hertz Equipment

Rental Corporation, which operated as an equipment rental company.  On June 30, 2016, there was a spin-off transaction involving HERC Holdings Inc. and Hertz.  In connection with the spin-off transaction, Hertz Global Holdings, Inc. changed its name to HERC Holdings Inc.  The entity now called Hertz Global Holdings, Inc. existed prior to the transaction and was called Hertz Rental Car Holding Company Inc.

8.      Plaintiff Herc Rentals Inc. ("HERC") is a Delaware corporation with its principal place of business in Bonita Springs, Florida.  It is primarily engaged in the business of equipment rental, offering a broad portfolio of equipment that includes mid-size and heavy equipment, specialty equipment and contractor tools.  It does business throughout the country.  Since July 1, 2016, HERC has operated as a completely separate business from Hertz.

9.      Royal Caribbean Cruises Ltd. ("RCL"), is a corporation with its principal place of business in Miami, Florida.  It is engaged in the global cruise business through its Royal Caribbean International, Celebrity Cruises and Azamara Club Cruises brands.  Celebrity Cruises, Inc. is a wholly-owned subsidiary of RCL to whom it has assigned its claim in this action.

10.     Hertz, HERC and RCL bring this Complaint on behalf of themselves, their subsidiaries, divisions and brands that purchase Visa or MasterCard merchant services so that its customers can use cards: (i) issued by a Visa or MasterCard Issuing Bank in the United States; (ii) processed or acquired by a Visa or MasterCard Acquirer or Processor (the term "Acquirer" as used hereinafter in this complaint shall also include Processors) in the United States; or (iii) whose Visa or MasterCard transactions are governed by United States law by virtue of contract or operation of law.

11.     During the Relevant Time Period, Defendants and their co-conspirators directly imposed and enforced the Merchant Restraints on Hertz, HERC and RCL, who each directly: (i) purchased from Defendants and their co-conspirators Visa and MasterCard merchant services in

the United States and in transactions governed by United States law; (ii) directly paid supracompetitive, artificially inflated Interchange Fees and Network Fees in the United States, and in transactions governed by United States law, to members of each of the unlawful horizontal conspiracies alleged in this Complaint; and (iii) sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators alleged in this Complaint.

12.     Each Plaintiff has standing to sue Defendants and co-conspirators under the U.S. antitrust laws for the damages and other relief sought in this Complaint.  Plaintiffs are also efficient enforcers of the antitrust violations detailed herein.  The Merchant Restraints are imposed and enforced directly on merchants, including Plaintiffs, by the Defendants and/or their co-conspirators.  The Merchant Restraints are not imposed or enforced by the Defendants on their co-conspirators or any entities other than merchants such as the Plaintiffs, rendering them the efficient enforcer to seek redress for the antitrust injury caused by the Merchant Restraints.

## III.   DEFENDANTS

13.     Prior to a March 19, 2008 initial public offering ("IPO"), Defendant Visa U.S.A., Inc. was a member of Defendant Visa International Service Association and was a non-stock Delaware membership corporation with its principal place of business in San Francisco, California.  It was a national bank-card association whose members included approximately 14,000 banks.  During the Relevant Time Period and until the Visa corporate re-structuring on March 19, 2008, Visa U.S.A., Inc. was governed by a Board of Directors composed of bank executives selected from its member banks.

14.     Prior to March 19, 2008, Defendant Visa International Service Association was a non-stock Delaware membership corporation with its principal place of business in Foster City, California. On March 19, 2008, the Visa entities completed an IPO.  Under a series of transactions that culminated in the IPO, Visa U.S.A., Inc. and Visa International Service Association became

subsidiaries of Defendant Visa, Inc., a Delaware corporation, with its principal place of business in San Francisco, California.  After the subsidiaries were unified under the ownership of Visa, Inc., the stock of the former members in each subsidiary was acquired by Visa, Inc.  Once the restructuring was completed, Visa, Inc. conducted an IPO of over 400,000,000 shares of Class A common stock. Visa Inc. acquired the ownership interest of certain member banks in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks.  Each of the Visa Defendants is and has been an active, knowing participant in the unlawful Visa activities alleged in this Complaint.  As set forth above, Defendants Visa International Service Association, Visa U.S.A., Inc., and Visa, Inc. are collectively referred to in this Complaint as "Visa."  Visa transacts business in this judicial district and throughout the United States.

15.    Defendant MasterCard Incorporated is a Delaware corporation with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated is a non-stock membership corporation and the principal operating subsidiary of MasterCard Incorporated, and has its principal place of business in Purchase, New York.  The members of Defendant MasterCard International Incorporated are Issuing and Acquiring Banks as defined in this Complaint.

16.    Prior to the week of May 22, 2006, 100% of the stock of MasterCard Incorporated was owned and controlled by the bank members of Defendant MasterCard International Incorporated.  During the week of May 22, 2006, MasterCard Incorporated acquired from MasterCard International Incorporated members and then sold to the public some of the stock it acquired.  Pursuant to the terms of that IPO, the members of MasterCard International Incorporated retained operating and effective control of MasterCard Incorporated.  Specifically, subsequent to the IPO, the member banks of MasterCard International Incorporated own 51% of the Class A voting stock of MasterCard Incorporated and hold additional shares of Class B and

Class M stock, which confer on the member banks additional rights to control the business of MasterCard Incorporated.  As a practical matter, MasterCard Incorporated previously was and remains effectively owned and controlled by the 25 member banks that issue approximately 98% of the MasterCard payment cards issued to cardholders in the United States and acquire over 95% of all MasterCard transactions from retail merchant consumers.  Both MasterCard Incorporated and MasterCard International Incorporated are and have been active and knowing participants in the unlawful MasterCard activity alleged in this Complaint.  As set forth above, MasterCard Incorporated and MasterCard International Incorporated are collectively referred to in this Complaint as "MasterCard."  MasterCard transacts business in this judicial district and throughout the United States.

17.     Visa and MasterCard have Issuing Bank members and Acquiring Bank members. The Issuing Bank and Acquiring Bank members (including Processors) are participants in the conspiracy alleged in this Complaint.  Issuing Banks have conspired with each other, with Acquiring Banks, and with Visa and MasterCard to implement and enforce the Visa and MasterCard Interchange Rates and/or Merchant Restraints.  Likewise, the Acquiring Banks (including Processors) have conspired with each other, with Issuing Banks, and with Visa and MasterCard to implement and enforce the Visa and MasterCard Interchange Rates and/or Merchant Restraints. The Visa and MasterCard Issuing and Acquiring Banks (including Processors) have had actual knowledge of and have knowingly participated in the conspiracies alleged in this Complaint.

IV.     **CO-CONSPIRATORS**

18.     During the Relevant Time Period, various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the antitrust violations alleged in this Complaint and have performed acts in furtherance of each of the conspiracies.  The co-conspirators include, but are not limited to, the

following: (a) Issuing Banks that have issued Visa and/or MasterCard payment cards and have agreed to set, fix and/or enforce, and/or set, fixed and/or enforced, Visa's and MasterCard's Interchange Rates charged to Plaintiffs and other merchants and/or agreed to promulgate, perpetuate and/or enforce, or promulgated and/or enforced, the Visa and MasterCard Merchant Restraints imposed on Plaintiffs and other merchants; (b) banks that are or were members of the Board of Directors of Visa and/or MasterCard and adopted and agreed to impose the Visa and/or MasterCard Interchange Rates and/or Merchant Restraints upon Plaintiffs and other merchants; and (c) banks that are Acquiring Banks and other Processors who acquire Visa and MasterCard transactions from Plaintiffs and other merchants and who agreed to adhere to and impose and have agreed to and imposed the Visa and/or MasterCard Interchange Rates and/or Merchant Restraints on Plaintiffs and other merchants.

19.     Co-conspirators include, without limitation, Bank of America, N.A., Bank of America Corporation and FIA Card Services, N.A. (collectively "Bank of America"); JPMorgan Chase & Co., Chase Bank USA, N.A., and Chase Paymentech Solutions, LLC (collectively "Chase"); Citigroup, Inc., Citibank N.A., and Citicorp Payment Services, Inc. (collectively "Citibank"); and Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Wells Fargo"), along with any Visa or MasterCard Issuing or Acquiring banks or processors that any of the foregoing acquired during the Relevant Time Period (*e.g.*, MBNA America Bank, N.A. merged with and into Bank of America; Chase acquired Bank One Corporation and Bank One Delaware, N.A., Washington Mutual Bank, and Providian National Bank; and Wachovia Bank, N.A. merged into Wells Fargo).

20.     Each co-conspirator had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

21.     In this Complaint, the references to "member banks" and "co-conspirator member banks" include co-conspirators as described in this Complaint.

## V.   JURISDICTION

22.     Counts I and II of this Complaint are civil antitrust claims arising under Section 1 of the Sherman Act (15 U.S.C. §1) and Section 4 of the Clayton Act (15 U.S.C. §15(a)).  This Court has subject-matter jurisdiction over Counts I and II pursuant to 28 U.S.C. §§1331 and 1337(a).

23.     Counts III through VI of this Complaint are civil antitrust claims arising under Section 2 of the Sherman Act (15 U.S.C. §2) and Section 4 of the Clayton Act (15 U.S.C. §15(a)). This Court has subject-matter jurisdiction over Counts III through VI pursuant to 28 U.S.C. §§1331 and 1337(a).

24.     The allegations in this Complaint should be read in the alternative, as necessary, to avoid inconsistency.

## VI.   VENUE

25.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391 in that each Defendant is an inhabitant of this District or is found or transacts business in this District.  Hertz, HERC and RCL do business in this District as well as in every state within the United States.

26.     The 4-year statute of limitations on Hertz's, HERC's and RCL's claims in this Complaint has been tolled from the date of the first-filed Class Action Complaint that became a part of MDL 1720 (E.D.N.Y.).

## VII.   DEFINITIONS

27.     The terms below have the following meanings as used in this Complaint:

(A)     "General Purpose Credit Cards" are payment cards that enable the holder to purchase goods or services from a seller that are to be paid for by the issuer of that card on behalf of the cardholder, repayment of which is set by agreement between the issuer and the holder.  The terms of that agreement generally result in different classes of cards which are known and defined as follows:

(1)    A "Credit Card" is a payment card not specific to any particular merchant that enables the cardholder to obtain goods, services or cash on credit issued by the issuing bank which is a member of a card network such as Visa or MasterCard.

(2)    "Kickback Credit Cards" or "Kickback Cards" are Credit Cards that offer rewards or other benefits to the cardholder and impose higher Interchange Fees on retail merchants than standard or non-Kickback Cards.  In 2002, approximately 15% of Visa Credit Cards issued in the United States were Kickback Credit Cards.  By 2010, in excess of 40% of the Visa and MasterCard branded payment cards in the United States were Kickback Credit Cards.

(B)    An "Issuing Bank" is a member of a payment card association or network, such as Visa or MasterCard, and issues payment cards to cardholder consumers for use as a payment device.  Subject to the anticompetitive restrictions and practices alleged below, Issuing Banks are horizontal competitors and compete with one another to issue Credit Cards to cardholder consumers and to encourage the use of their cards by cardholder consumers.

(C)    An "Acquiring Bank" is a member of a credit card association or network, such as Visa or MasterCard, that acquires payment transactions from merchants and enforces card network rules, regulations, restraints and fee structures.  Subject to the anticompetitive restrictions and practices alleged below, Acquiring Banks are horizontal competitors and compete against each other and against other processors to acquire the transaction business of retail merchants.

(D)    A "Merchant" is an entity that provides goods or services, including lease or rental services, to customers and accepts payment in exchange for those goods or services.

(E)     "Network Services" are the collection of services that Visa and MasterCard provide to retail merchants that purchase their payment card merchant services and to banks who issue payment cards to cardholders.  These Network Services include authorization, clearance and settlement of retail transactions using the Visa or MasterCard networks.  Visa and MasterCard are horizontal competitors and compete against each other to provide network services to retail merchants and Issuing Banks.  The anticompetitive and restrictive rules and practices alleged in this Complaint substantially and unreasonably restrain competition between MasterCard and Visa and, in particular, eliminate horizontal price competition between MasterCard and Visa for the use of their respective Credit Cards at the point of sale or interaction.

(F)     "Interchange Fee" or "Interchange Rate" is the fee (or price) that merchants pay to the Issuing Bank in connection with each retail transaction in which the Issuing Bank's card is used as the method of payment.  Pursuant to the agreements by and among (i) Visa and its member banks and (ii) MasterCard and its member banks, Interchange Rates are set by the rules of each Network and enforced by each Network's member banks (*i.e.*, Visa's and MasterCard's co-conspirators) through required terms that are included in their contracts with merchants.  In the absence of a bilateral agreement between a merchant and an Issuing Bank, the rules of Visa and MasterCard, to which merchants are required to adhere, provide that all card transactions will occur at the default Interchange Rate set by the Network.  Because the Issuing Bank will receive at least the default Interchange Rate if it does not bilaterally negotiate a lower Interchange Rate with a merchant, there is no benefit or reason for the Issuing Bank to agree to a lower Interchange Rate with the Merchant Restraints in place.  However, absent the Merchant Restraints, Issuing Banks would negotiate lower Interchange Rates if Plaintiffs and other merchants could use the price mechanism (*i.e.*, discounts and surcharges) or other communication about payment preference to disfavor high-cost payment means.  Under those

circumstances, as noted earlier, Issuing Banks would lose transaction volume if they kept their prices (*i.e.*, Interchange Rates) too high.  In the absence of the Merchant Restraints, Issuing Banks would lower their Interchange Rates to avoid a loss of volume or to gain volume at the expense of other competing Issuing Banks.  The MasterCard and Visa Merchant Restraints thus prevent merchants, including Plaintiffs, from using price signals at the point of sale to offer customers lower prices if they pay with a lower-cost payment means.  In the presence of the Merchant Restraints, the default Interchange Rate is in practice a fixed price, which is significantly greater than the competitive price would be.

(G)   "Network Fees" refer to all Visa or MasterCard fees other than the Interchange Fee that are paid by the merchant in connection with the use of a Visa or MasterCard credit card.  Examples of Visa's and MasterCard's Network Fees include Visa's "Credit Assessment" fee, Visa's "Authorization Processing Fee," Visa's "Base II" settlement network access fee, MasterCard's "Network Access and Brand Usage" fee, and MasterCard's "Assessment" fee.

(H)   The "No Surcharge" Rule is a rule that was adopted by both the Visa association and the MasterCard association prior to January 1, 2004.  During the Relevant Time Period, the Visa "No Surcharge" Rule prohibited merchants from imposing a surcharge on any Visa payment card transaction so as either to reflect the cost differences among various payment methods or to incentivize cardholder consumers to use less expensive payment forms.  Similarly, the MasterCard "No Surcharge" Rule prevented merchants from imposing a surcharge on any MasterCard payment card and thereby prevented merchants from using price either to reflect the cost differences among various payment methods or to incentivize cardholder consumers to use less expensive payment forms.  For example, each Network prohibited merchants from surcharging cardholders who used their higher-priced Kickback Card rather than their lower-priced standard card.  If merchants could surcharge the higher-priced Kickback Cards, then cardholder

consumers would switch to the lower-cost standard cards.  If the Network or Issuing Banks did not want to lose transaction volume, then they would have to lower their Interchange Rates on Kickback Cards to competitive levels.  Similarly, if merchants could surcharge MasterCard cards and/or Visa cards, then the merchant could use price to incentivize the cardholder consumer to switch to whichever Network charged the merchant lower prices.  In order to avoid a loss of transaction volume, each Network would have to lower its price to the competitive level so as to avoid being targeted and surcharged by merchants.  Among other effects, the "No Surcharge" Rule eliminates any incentive for either Visa or MasterCard or any other competing card network or any Issuing Bank to charge a lower Interchange Rate because such lower Interchange Rate will not be visible to cardholder consumers and will not lead to increased usage by cardholder consumers or increased transaction volume for the network or for the Issuing Bank that lowered its rate.  The "No Surcharge" Rule also gives Visa and MasterCard an incentive to encourage cardholder consumers to use the most expensive (to the merchant) payment card rather than the most cost-efficient card or payment method.  It is contrary to the independent economic self-interest of each Visa Bank Member to prevent merchants from surcharging the payment cards of other Visa Bank Members.  It is similarly contrary to the independent economic self-interest of each MasterCard Bank Member to prevent merchants from surcharging the payment cards issued by other MasterCard Bank Members.

(I)    The "No Discount" Rule was adopted by the Visa association and the MasterCard association prior to January 1, 2004.  The Visa "No Discount" Rule prohibited merchants from: (1) granting to any cardholder consumer a discount to use a Visa payment card issued by any particular Visa Issuing Bank but not offered to cardholder consumers who use a Visa payment card issued by any other Visa Issuing Bank; and (2) issuing a discount to any cardholder consumer to use a non-Visa payment card.  Under this restraint, the merchant could not charge a

lower price to incentivize the cardholder consumer to use a Visa payment card issued by a bank that charges the merchant a lower fee to buy its merchant services, nor could the merchant charge a lower price to a cardholder consumer if the cardholder consumer used the card of a competing card network such as MasterCard or Discover.  The MasterCard "No Discount" rule worked in the same way as the Visa "No Discount" Rule, except that the MasterCard Rule prevented a merchant from charging a lower price for the use of a non-MasterCard payment card or a lower price for the use of a particular Issuing Bank's MasterCard.  The "No Discount" and "No Surcharge" rules of Visa prevented a merchant from charging more to a cardholder consumer who used a Visa Card (even if Visa was more costly for the merchant to purchase) or less to a cardholder consumer who used a competing network's payment card (even if that competing network's card was less expensive for the merchant to purchase).  The MasterCard "No Discount" and "No Surcharge" Rules operated in effect the same way as the Visa "No Discount" and "No Surcharge" Rules, and similarly precluded price competition either between competing card networks or between competing Issuing Banks of the same branded card at the point of sale for cardholder consumer use of payment cards.  It is contrary to the independent economic self-interest for a bank member of Visa that is also a member of MasterCard (or vice versa) to prohibit a merchant from offering a discount to a cardholder consumer to use that bank's MasterCard (or Visa) or to prohibit a merchant from offering a discount to cardholder consumers to use its card when the merchant did not also offer discounts to customers using a Visa card issued by a competing Issuing Bank (or vice versa).

(J)     The "No Discrimination" Rule was adopted by the MasterCard association prior to January 1, 2004.  The MasterCard "No Discrimination" Rule prohibited merchants from discouraging the use of MasterCard in favor of another payment card.  MasterCard's "No Discrimination" Rule was designed to cover instances that were not already addressed by MasterCard's "No Surcharge" and "No Discount" Rules in which merchants could express a

preference to their customers for another payment card over MasterCard payment cards.  Under this restraint, merchants could neither express a preference to persuade its customers to use a Visa payment card issued by a bank that charges the merchant a lower fee to purchase its merchant services, nor express a preference to persuade its customers to use the card of a competing card network such as Visa or Discover.  Like the "No Discount" and "No Surcharge" Rules, the MasterCard "No Discrimination" Rule precluded price competition either between competing card networks or between competing Issuing Banks of the same branded card to be the favored method of payment at the point of sale.  It is contrary to the independent economic self-interest of each MasterCard Bank Member to prevent merchants from disfavoring the payment card of other MasterCard Bank Members.  It is similarly contrary to the independent economic self-interest for a bank member of MasterCard that is also a member of Visa to prohibit a merchant from expressing a preference at the point of sale to use that bank's Visa card.

(K)     As noted earlier, the "No-Surcharge" Rule, the "No-Discount" Rule, and the "No-Discrimination" Rule are referred to collectively in this Complaint as the "Merchant Restraints."

(L)     The term "Network" as used in this Complaint means the Visa and/or MasterCard payment card network as context requires, including the Issuing Banks and Acquiring Banks which belong to the Visa and/or MasterCard network.

## VIII.  TRADE AND COMMERCE

28.     Defendants are engaged in interstate commerce and the unlawful activities alleged in this Complaint have occurred in, and have substantially affected, interstate commerce.  To the extent that a subpart of the Visa or MasterCard payment card transactions at issue in this Complaint occurred outside the United States or a United States territory, those transactions are subject to the United States antitrust laws because, *inter alia,* (i) they are governed by agreements under which United States law would apply; (ii) the transactions themselves involved United States

commerce (*e.g.*, a Visa or MasterCard payment card issued by a Visa or MasterCard Issuing Bank in the United States or a Visa or MasterCard payment card transaction acquired by a Visa or MasterCard Acquiring Bank or Processor in the United States); and/or (iii) the supracompetitive Interchange Rates and Network Fees charged to one or more Plaintiffs and others in the United States, and/or the enforcement of the Merchant Restraints against or more Plaintiffs and other merchants in the United States, is a direct, substantial and reasonably foreseeable effect on United States commerce, and that domestic effect gives rise to that portion of one or more Plaintiff's claims alleged in this Complaint that involve payment card transactions with Visa or MasterCard which occurred outside the United States.  Plaintiffs do not seek to recover damages for exclusively foreign Visa or MasterCard credit card transactions with exclusively foreign Visa or MasterCard cardholders whose Visa or MasterCard payment card transactions either do <u>not</u> involve (i) a credit card issued by a Visa or MasterCard Issuing Bank in the United States, (ii) Visa or MasterCard payment card transactions acquired (or processed) by a United States Acquirer (or Processor), or (iii) a Visa or MasterCard payment card transaction governed by United States law by virtue of a contract or operation of United States law.

IX.    <u>INJURY TO CONSUMER WELFARE, CHOICE AND COMPETITION</u>

29.    The conspiracy between MasterCard and its member financial institutions (or banks) and between Visa and its member financial institutions (or banks) alleged in this Complaint (1) set Interchange Rates and Network Fees to Hertz, HERC and RCL at supracompetitive levels, and (2) protects and preserves artificially high Interchange Rates and Network Fees by imposing and enforcing the Merchant Restraints directly on Plaintiffs and others.  If merchants could offer customers lower-priced payment means by offering discounts for the use of a lower cost payment product or charging a price, *i.e.*, a surcharge, on higher cost payment products, then they could use the price mechanism to lower merchants' Interchange Rates and Network Fees.  The higher

cost payment forms, such as MasterCard and Visa Credit Cards, and especially their respective Kickback Credit Cards, would lose cardholder consumer usage as those consumers would switch to the lower cost discounted cards or away from the higher cost surcharged cards.  In order to avoid a loss of transaction volume to less expensive payment cards, MasterCard and/or Visa would have to lower its/their anticompetitively high prices or face a pro-competitive loss of transaction volume as cardholder consumers switched to lower cost payment cards in order to obtain a discount or avoid a surcharge.  Presented with the opportunity to increase their volume of transactions, payment card providers such as the Discover Card, or debit card providers, could offer lower prices to merchants for their lower cost products, who would discount the Discover Card or a debit card or surcharge the MasterCard and/or Visa Credit Cards.  In the absence of the Merchant Restraints, the merchants could credibly threaten to discount low-cost payment cards or surcharge high-cost payment cards and MasterCard and Visa and the Issuing Banks would respond by lowering their prices to competitive levels rather than face the loss of transaction volume that they would suffer if the offer to differentially price their payment cards was implemented.

30.     Due to the anticompetitive Merchant Restraints, MasterCard and Visa were able to increase the Interchange Fees and Network Fees charged to each Plaintiff and other merchants. For example, Plaintiffs and other merchants paid higher Interchange Fees to purchase merchant services associated with Kickback Cards than with non-Kickback Cards.  As a result, when MasterCard, Visa and their respective Issuing Bank members reclassified standard Credit Cards as Kickback Cards or simply issued more Kickback Cards and fewer standard cards, the Interchange Rates paid by merchants increased significantly because a greater proportion of merchants' transaction volume involved higher-price Kickback Cards.  If merchants could have resisted those price increases by, for example, surcharging the Kickback Cards or discounting the standard cards, then Defendants would have encountered the risk of the loss of transaction volume on their

Kickback Cards – which is exactly what is supposed to occur in a competitive market in which the price mechanism is allowed to function.  Due to the Merchant Restraints, however, merchants could not charge differential prices for Kickback and non-Kickback cards that would accurately reflect the costs associated with each, either by charging an additional price to purchase the merchant services associated with the Kickback Cards (*i.e.*, a surcharge) or offering a lower price to customers who use non-Kickback Cards (*i.e.*, a discount).  Consequently, all cross-elasticity of demand at the point of sale between the high-cost cards and the lower-cost cards was destroyed.  The destruction of that cross-elasticity of demand allowed MasterCard, Visa and their respective co-conspirators to exercise substantial market or monopoly power – meaning the power to raise price without losing so much in sales as to render the price increase unprofitable.  Indeed, the Merchant Restraints in this case were so effective at destroying the cross-elasticity of demand and horizontal price competition at the point of sale that MasterCard and Visa were able to substantially increase their prices to merchants by, for example, issuing more Kickback Cards without losing any transactional volume at all.

31.     Each conspiracy alleged in this Complaint has had an anticompetitive impact on the market and injures economic efficiency and consumer welfare in at least the following ways:

(A)     Supracompetitive Interchange Rates create incentives for Issuing Banks to encourage the use of high-cost payment cards rather than low-cost payment cards and thereby encourage inefficiency and misallocation of resources;

(B)     Supracompetitive Interchange Rates distort competition between different Credit Cards in favor of products with higher Interchange Rates; and dissuade new entrants or existing competitors from trying to increase their transaction volume by offering lower prices because the Merchant Restraints preclude offers of lower prices to the merchant from being translated into a lower price to the cardholder consumer, which would then result in higher usage

of the lower-cost Credit Card by cardholder consumers.  In other words, the Merchant Restraints accomplish their specifically intended anticompetitive purpose, which is to eliminate horizontal price competition among Credit Cards and the payment card networks for cardholder consumer use of their payment products at the point of sale, and to erect barriers to entry to low-cost cards or other innovative payment means.

32.    The collective setting of Interchange Rates prior to the Visa and MasterCard IPOs, and the imposition of the Merchant Restraints by Visa and its member banks and by MasterCard and its member banks, restricted competition among the member banks of each respective network for the provision of payment card Network Services to merchants.   Absent the conspiracies alleged in this Complaint, the Issuing Bank members of both networks could negotiate individually with merchants and merchants would be able to surcharge their customers for using Credit Cards issued by a particular bank.  Likewise, merchants could offer point of sale discounts to cardholders using a network's card that had a lower Interchange Rate or lower Network Fees, or for cardholders of an Issuing Bank that had agreed to give the merchant a lower Interchange Rate than other Issuing Banks.  Thus, the merchant could incent horizontal price competition in Interchange Fees among the various Issuing Bank members of Visa and also incent horizontal price competition among the Issuing Bank members of MasterCard.   Under these circumstances, prices and output would be responsive to the cost of providing credit card services.

**X.    RELEVANT MARKET**

33.    The relevant geographic market in this case is the United States.

34.    There are at least three relevant product markets in which the restraints and other conduct alleged in this Complaint have had an anticompetitive effect.  Those relevant product markets, each alleged in the alternative, are:

(A)      General Purpose Credit Cards Network Services ("GPCC Network Services").

*See United States v. Visa*, 344 F.3d 229, 239 (2d Cir. 2003) ("*U.S. v. Visa*").

(B)      The Visa Credit Card platform.

(C)      The MasterCard Credit Card platform.

35.      The term "relevant market" as used in this Complaint means the relevant product market alleged in subparagraph (A) in the immediately preceding paragraph and, in the alternative, subparagraphs (B) and (C) in the immediately preceding paragraph unless one or the other product market is specifically alleged.

36.      In the GPCC Network Services relevant market, payment card networks sell Network Services to merchants.  This case relates to restraints that affect competition for the sale of Network Services to merchants, which in turn have effects on cardholders in the separate, but related market for General Purpose Credit Cards.  The Interchange Fee, together with any Network Fees, is the price directly paid by merchants (including Plaintiffs) to receive payment for a transaction consummated with a General Purpose Credit Card.  Visa and MasterCard, in concert with each Network's financial institution members, set Interchange Fee rates paid by merchants for Visa and MasterCard Credit Card transactions to Visa and MasterCard Issuing Banks.  Visa and MasterCard also set Network Fees paid by merchants associated with the use of Visa and MasterCard Credit Cards, respectively.  Merchants directly pay billions of dollars a year to purchase Network Services in the relevant market, and this amount increases rapidly from year to year.

37.      A seller with market power over Network Services associated with General Purpose Credit Cards in the United States can raise Interchange Fees and Network Fees to merchants (including Plaintiffs) substantially above the competitive level without losing sufficient business to make the price increase unprofitable.  Plaintiffs cannot substitute other payment methods (such as debit, cash or checks) for General Purpose Credit Cards because of the Merchant Restraints.  As a

result, other payment methods, such as cash or checks, are not sufficiently close substitutes for General Purpose Credit Cards for merchants, and merchants will not stop taking General Purpose Credit Cards and switch to only alternative payment forms if they experience a non-transitory price increase in Interchange Fees.

38.     At all relevant times, Visa and MasterCard have each had substantial market power in the GPCC Network Services relevant market as demonstrated by: (1) their ability to raise Interchange Fees and Network Fees without losing business to other sellers or other payment methods; (2) their ability to eliminate price competition from other Credit Card networks for merchants' transaction volume through the Merchant Restraints; (3) their ability to raise barriers to entry to new payment card networks or alternate card products from existing networks that would compete using lower prices to merchants; (4) their ability to price-discriminate among different classes of merchants; (5) their ability to shift Credit Card usage from standard cards to Kickback Cards, which have even higher and faster-growing Interchange Fees, without losing transaction volume; and/or (6) their ability to require merchants to charge the same retail prices to Visa and MasterCard cardholders who use Kickback Cards as to other customers, even though Visa and MasterCard Kickback Cards impose a higher cost on the merchant than debit cards, non-Kickback Visa and MasterCard Credit Cards, and other forms of payment.

39.     There are significant barriers to entry in the GPCC Network Services relevant market.  No company has successfully entered the market since 1985.  Entry is estimated to cost over $1 billion.

40.     Visa and MasterCard and their co-conspirators, though the imposition of the Merchant Restraints, have produced anticompetitive effects in the GPCC Network Services market, including: (1) the elimination of inter-network price competition (*e.g.*, Visa vs. MasterCard) for merchants' transaction volume; (2) the elimination of intra-network price competition among

Issuing Banks (*e.g.*, Chase vs. Wells Fargo) for merchants' transaction volume; (3) raising barriers to entry for new networks that seek to compete with a low-merchant-price business model; (4) charging supracompetitive Interchange Fees and Network Fees; and (5) promoting the inefficient cross-subsidization of cardholders with Visa and MasterCard Kickback Cards by customers who use cash, debit, and other low-cost payment forms.

41.     The GPCC Network Services market is closely related to, but distinct from, the market for General Purpose Credit Cards, in which issuing banks sell services to cardholders. *United States v. American Express*, 2016 WL 5349734, at *13 (2d Cir. Sept. 26, 2016).  As discussed below, the challenged conduct has had anticompetitive effects on cardholders in the General Purpose Credit Card market in addition to its anticompetitive effects on merchants in the GPCC Network Services market.  Alternatively, the challenged conduct has had net anticompetitive effects taken as a whole when looking at the General Purpose Credit Card market and the GPCC Network Services together.

42.     The restraints and other conduct alleged in this Complaint have had an anticompetitive effect in the related market for General Purpose Credit Cards.  In the market for General Purpose Credit Cards, Issuing Banks are the sellers and cardholders are the buyers.  The restraints and other conduct alleged in this Complaint have had the following anticompetitive effects in the General Purpose Credit Card market:

- They have denied Visa and MasterCard cardholders, and other users of General Purpose Credit Cards, the benefits of price competition among Networks or among Issuing Banks at the point of sale.  In particular, cardholders have been denied the opportunity to receive discounts or other benefits at the point of sale in exchange for using a Visa, MasterCard, another

network's Credit Card, or a particular Issuing Bank's Credit Card, that the merchant prefers.

- The restraints and other conduct alleged in this Complaint have reduced output and decreased quality in the General Purpose Credit Card market because they have reduced the amount of differentiation in Credit Card products that would otherwise exist.  For example, the restraints and other conduct alleged in this Complaint have eliminated or reduced the incentives for Issuing Banks or other General Purpose Credit Card Networks to compete by offering differentiated Credit Card products for cardholders who would prefer an immediate discount or benefit from the merchant at the point of sale instead of more complicated, indirect, or limited methods of conferring benefits on the cardholder, such as amassing loyalty points that can only be redeemed at certain times, at certain merchants, or are subject to other conditions.  Consequently, cardholder consumers (and potential consumers) in the General Purpose Credit Card market have been unable to choose from, or to use, differentiated General Purpose Credit Cards that offer such immediate point of sale benefits.

- The restraints and other conduct alleged in this Complaint have had an anticompetitive effect on Visa and MasterCard cardholders, and other users of General Purpose Credit Cards, who do not use high-interchange Visa and MasterCard Kickback Cards since the Merchant Restraints effectively prohibit differential pricing among payment mechanisms (or even non-price steering mechanisms seeking to shift cardholder consumers to lower cost payment mechanisms).

- The restraints and other conduct alleged in this Complaint have denied all Visa and MasterCard cardholders truthful information about the costs of Visa and MasterCard credit cards, which would be used by Visa and MasterCard cardholders to make informed decisions about which form of payment to use.

43. Alternatively, the Visa Credit Card platform and the MasterCard Credit Card platform are each relevant markets. In the Visa Credit Card platform and the MasterCard Credit Card platform, merchants and credit cardholders are consumers of the platform. The Visa Credit Card platform is not reasonably interchangeable with other payment card platforms from the perspective of Plaintiffs and other merchant consumers of the Visa platform. Merchants, including Plaintiffs, are direct purchasers of platform services from the Visa and MasterCard platforms, which include Defendants and their respective co-conspirator member banks. Likewise, the MasterCard Credit Card platform is not reasonably interchangeable with other payment card platforms from the perspective of Plaintiffs and other merchant consumers of the MasterCard platform.

44. At all relevant times, Visa has had a 100% market share and substantial market power in the Visa platform relevant market. Visa's and its co-conspirators' conduct challenged in this Complaint has had a net anticompetitive effect on all sides of the Visa platform. For example, Visa's and its co-conspirators' conduct has resulted in: (1) the elimination of price competition among issuers of Visa Credit Cards for merchant preference at the point of sale; (2) the elimination of price competition among Visa and other Credit Card platforms for merchant preference at the point of sale; (3) the imposition or raising of barriers to entry on alternative Credit Card platforms; (4) the imposition of Network Fees by Visa on merchants that have no connection to rewards or other cardholder benefits; (5) a reduction in incentives for issuers to offer Visa Credit Card products for which a Visa cardholder may obtain an immediate discount or other benefit at the

point of sale instead of rewards or other delayed or limited benefits; (6) causing all Visa cardholders to pay higher retail prices for goods and services in order to cover the merchant's cost of high-interchange fee Visa Credit Cards; (7) denying Visa cardholders truthful information about the costs of Visa Credit Cards, which would be used by Visa cardholders to make more informed decisions about what form of payment to use; (8) a "net" price charged by Visa to merchants and other users of the Visa platform that is higher than it otherwise would be in the absence of Visa's and its co-conspirators' anticompetitive conduct; and (9) requiring merchants to charge all of their customers the same retail price, regardless of what payment form is used, thereby causing the inefficient subsidization of Visa Kickback Card users by users of other payment forms.

45. At all relevant times, MasterCard has had a 100% market share and substantial market power in the MasterCard platform relevant market. MasterCard's and its co-conspirators' conduct challenged in this Complaint has had a net anticompetitive effect on all sides of the MasterCard platform. For example, MasterCard's and its co-conspirators' conduct has resulted in: (1) the elimination of price competition among issuers of MasterCard Credit Cards for merchant preference at the point of sale; (2) the elimination of price competition among MasterCard and other Credit Card platforms for merchant preference at the point of sale; (3) the imposition or raising of barriers to entry on alternative Credit Card platforms; (4) the imposition of Network Fees by MasterCard on merchants that have no connection to rewards or other cardholder benefits; (5) a reduction in incentives for issuers to offer MasterCard Credit Card products for which a MasterCard cardholder may obtain an immediate discount or other benefit at the point of sale instead of rewards or other delayed or limited benefits; (6) causing all MasterCard cardholders to pay higher retail prices for goods and services in order to cover the merchant's cost of high-interchange fee MasterCard Credit Cards; (7) denying MasterCard cardholders truthful information about the costs of MasterCard Credit Cards, which would be used by Visa cardholders

to make more informed decisions about what form of payment to use; (8) a "net" price charged by MasterCard to merchants and other users of the MasterCard platform that is higher than it otherwise would be in the absence of MasterCard's and its co-conspirators' anticompetitive conduct; and (9) requiring merchants to charge all of their customers the same retail price, regardless of what payment form is used, thereby causing the inefficient subsidization of MasterCard Kickback Card users by users of other payment forms.

## XI.    FACTUAL ALLEGATIONS

46.     Prior to the IPO on March 19, 2008, Visa was a national bank-card association whose members included banks, regional banking associations and other financial institutions. Visa was established by its members to develop, promote and operate a national bank Credit Card network.

47.     Visa's predecessor, Bank Americard, was the local credit card program of Bank of America, based in California.  In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI").  In 1977, NBI changed its name to Visa.

48.     Prior to the IPO on May 25, 2006, MasterCard was a national bank-card association whose members included banks, regional banking associations and other financial institutions. MasterCard was established by its members to develop, promote and operate a national bank Credit Card network.

49.     MasterCard's predecessor, the Interbank Card Association, was a credit card program established in 1966.  In 1969, the program was purchased by the California Bank Association and its name was changed to "Master Charge."  In 1979, the association was renamed MasterCard.

50.     During Visa's and MasterCard's early years, merchants that purchased merchant services for General Purpose Credit Cards made paper records of transactions, which were then processed to the merchant's Acquiring Bank and the cardholder's Issuing Bank.

51.     Since the simple and somewhat crude beginnings, the Visa and MasterCard systems have evolved into mature systems that place anticompetitive restrictions on the technologically efficient payment card market.

52.     The GPCC Network Services market today is a saturated, mature market characterized by high levels of concentration for both Issuing and Acquiring Banks.  The top seven issuers issue more than 90% of all Credit Cards and the top eight Acquiring Banks acquire and process more than 90% of all payment card transactions.  Similarly, Visa has a 100% share of the Visa Credit Card platform market, and MasterCard has a 100% share of the MasterCard Credit Card platform market.

53.     The relevant market is also characterized by a low and decreasing cost structure. In a competitive market, decreasing costs of production result in lower and decreasing prices.  Due to the anticompetitive practices alleged in this Complaint, however, the prices that merchants pay for MasterCard and Visa payment card services are, and for many years have been, increasing at a rapid rate, despite the sharply decreasing costs that MasterCard and Visa and their member banks have experienced and continue to experience.  In addition, the "net" price for merchants and cardholders in the Visa Credit Card platform market and the MasterCard Credit Card platform market has not declined commensurate with Visa's and MasterCard's (and their member banks') sharply decreasing costs.

54.     Visa and MasterCard, in concert with their respective financial institution members, set and determine the Interchange Fees paid by merchants, including Plaintiffs.  Issuing Banks do not, and have not, independently negotiated Interchange Fees with merchants (including

Plaintiffs) in a systematic way or to a competitively significant extent.  As a result of the Merchant Restraints, retail merchants (including Plaintiffs) have no practical ability to negotiate a lower Interchange Fee because they are required to purchase network services for a Visa or MasterCard card issued by the bank in question as long as they purchase the network services for any Visa or MasterCard card issued by other banks; and they are prohibited from using normal economic incentives to reduce the price they pay by either surcharging high-cost cards or discounting low-cost cards.  Thus, a merchant's only option, in the face of an increase in Interchange Fees by either Visa or MasterCard, is to decline Visa or MasterCard products entirely, an option that is not economically feasible or realistically available.

55.    The Visa financial institution members and the MasterCard financial institution members, in concert with Visa and MasterCard, respectively, devised, adopted and agreed to enforce, and did enforce, the Merchant Restraints, which have the purpose and effect of preventing merchants, including Plaintiffs, from resisting increases in Interchange Fees by either rejecting high-cost cards or by influencing customers to use the less expensive payment cards. The Merchant Restraints have the effect of severing the connection that exists in a properly functioning market between higher prices (*i.e.*, Interchange Fees) and lower merchant consumer demand for the product or service in question (*i.e.*, Visa or MasterCard Credit Card usage).

56.    Interchange Fees were devised in the early days of the Visa and MasterCard Networks for the purpose of paying for the costs of transferring transaction paper between the Acquiring Banks and the Issuing Banks and, purportedly, to balance network costs between issuers and acquirers.

57.    The justification offered in the early 1980s for Interchange Fees was that the fees were to induce banks to issue cards to cardholders, which in turn would help "acquire" merchants

for the association.  With the maturation of the market as alleged above, those purported justifications ceased to have any economic relevance or validity at least as early as 1990.

58.     Further, the ubiquity of Visa and MasterCard today has resulted in Visa and MasterCard no longer possessing in a meaningful way the key defining characteristics of a "two-sided" platform.  One such characteristic of a two-sided platform is that the addition of users on one "side" of the platform attracts more users or affects demand from users on the other "side" of the platform.  In the early 1980s, it very well may have been that the addition of Visa and MasterCard cardholders induced more merchants to purchase Visa and MasterCard merchant services.  Likewise, in the early 1980s, the addition of merchants purchasing Visa and MasterCard merchant services may have led to additional Visa and MasterCard cardholders.  However, today, Visa and MasterCard Credit Cards are held by millions of customers such that the additional cardholding has no meaningful effect on the number of merchants purchasing Visa and MasterCard merchant services.  And, today, because Visa and MasterCard already enjoy widespread use among merchants, the addition of merchants purchasing Visa and MasterCard services has no meaningful effect on the number of Visa and MasterCard cardholders.

59.     In addition, in an efficient "two-sided" platform, price changes to users on one side of the platform affect demand from users on the other side of the platform.  This characteristic of "two-sided" platforms is also not present for Visa and MasterCard.  Visa's and MasterCard's Interchange Fees are not cost-based, and increases to Interchange Fees are not offset by increases in rewards to cardholders.  Also, as a result of their substantial market power, Visa and MasterCard each have been able to impose additional Network Fees on Plaintiffs' and other merchants during the Relevant Time Period that have increased Plaintiffs' and other merchants' cost of Visa and MasterCard General Purpose Credit Cards, and those fees have no connection to

any increased value of Visa or MasterCard to merchants or any other aspect of cardholders' usage of Visa and MasterCard General Purpose Credit Cards.

60.     Today, in contrast to the early 1980s, Visa and MasterCard have each established market power as a matter of adjudicated fact and appellate affirmation. *See United States v. Visa*, 344 F.3d 229, 239 (2d Cir. 2003).  As the Second Circuit noted, even in the face of frequent and significant increases in Interchange Rates, merchants have no choice but to continue to purchase Visa and MasterCard merchant services.

61.     In view of the present-day penetration of Visa and MasterCard Credit Cards, banks now would find it in their interest to issue Visa and/or MasterCard Credit Cards and acquire merchant transactions, even without the promise of collusively set Interchange Rates that are defended and protected by the Merchant Restraints.  Visa, MasterCard and their respective co-conspirator member banks' unlawful conduct has prevented Interchange Rates from being determined by the free interaction of the laws of supply and demand and the operation of the normal price mechanism in which cardholder consumers know the price and decide whether to pay it or to switch to a lower-cost substitute service or product.

62.     The Visa and MasterCard Networks could function efficiently without collectively determined and implemented Interchange Rates and/or the Merchant Restraints.  Even if Visa, MasterCard and their respective member banks did not collectively set Interchange Rates and/or the Merchant Restraints, Visa and MasterCard could continue to operate as a clearinghouse between Issuing and Acquiring Banks.  In other words, collectively determined Interchange Rates and/or Merchant Restraints designed to prevent merchants from offering customers lower prices to pay with a less expensive payment means so as to resist artificially high Interchange Rates are not functionally necessary to the existence and operation of the Visa network or the MasterCard network.  Similar payment card networks in other countries function efficiently without the

Merchant Restraints and/or collectively set and implemented Interchange Rates, and the fees they charge are a fraction of those charged by Defendants in the United States.

63.     The collective setting and implementation through use of the Merchant Restraints of the Interchange Rates is not reasonably necessary to the operation of either the Visa network or the MasterCard network.  Market forces, rather than collective action, should determine the level of Interchange Fees.

64.     In their quest to extract ever higher revenue from merchants like Plaintiffs through the exercise of their market power, Visa and its co-conspirator member banks, and MasterCard and its co-conspirator member banks, have each instituted a number of pricing tiers for different classes of merchants and have set Interchange Rates for standard and Kickback Cards using those pricing tiers.  Visa and its co-conspirator member banks and MasterCard and its co-conspirator member banks each enforce these pricing tiers and excessive Interchange Rates through their Merchant Restraints, which insulate the pricing tiers and Interchange Rates from competitive and normal market forces and, in particular, from the operation of the price mechanism at the point of sale.

65.     Prior to its IPO in May 2006, MasterCard and its co-conspirator member banks collectively and in combination with each other agreed to impose the Merchant Restraints on all merchants, enforce those restraints against merchants, and require each merchant to agree in writing to adhere to the Merchant Restraints.  Prior to May 2006, MasterCard and its co-conspirator member banks also collectively and in combination with each other agreed to and determined the Interchange Rates that would be paid by the merchants.

66.     Subsequent to May 2006 and during the Relevant Time Period, MasterCard and its member banks undertook no acts that would defeat the purpose and effect of the Merchant Restraints.  To the contrary, subsequent to May 2006, MasterCard continued to promulgate and

enforce the Merchant Restraints against Plaintiffs and other merchants, and each MasterCard member bank agreed in writing, and knew that every other member bank agreed in writing, to continue to adhere to and impose the Merchant Restraints on every merchant (including Plaintiffs). Subsequent to May 2006, MasterCard and its member banks knowingly and intentionally continued to enforce the Merchant Restraints and to receive the anticompetitive benefits, including artificially high Interchange Fees, of their prior conduct and continued to commit acts, including the enforcement of the Merchant Restraints, that promoted the purpose and effect of their conspiracy.

67.     Subsequent to May 2006, MasterCard's member banks, through MasterCard, collectively agreed to enforce the Merchant Restraints against Plaintiffs and other merchants.  It would be contrary to the independent self-interest of each of MasterCard's bank members to prevent merchants from discounting Credit Cards which it issues or surcharging Credit Cards issued by its competitors.  However, if each MasterCard member bank knew and understood and tacitly agreed (as it did) that the other MasterCard member banks would reciprocate by preventing merchants from surcharging that member's Credit Cards, or discounting their own Credit Card, then it would be in the collective economic interest of all the MasterCard member banks to have MasterCard set the Interchange Rates at excessively high supracompetitive levels and then to defend those rates against the forces of competition by agreeing to and actually imposing the Merchant Restraints on every merchant who purchases MasterCard merchant services. Subsequent to May 2006, MasterCard and each of its member banks consciously ascribed to and knowingly participated in a common scheme and understanding that MasterCard Interchange Rates would be set and/or remain at supracompetitive levels, and that those excessive price levels would be enforced by the member banks through the continued promulgation and enforcement of the Merchant Restraints.

68.     Prior to its IPO on March 19, 2008, Visa and its co-conspirator member banks collectively and in combination with each other agreed to impose the Merchant Restraints on all merchants, enforce those restraints against merchants, and require each merchant to agree in writing to adhere to the Merchant Restraints.   Prior to that date, Visa and its co-conspirator member banks also collectively and in combination with each other agreed to and determined the Interchange Rates that would be paid by the merchants.

69.     Subsequent to March 19, 2008, and during the Relevant Time Period, Visa and its member banks undertook no acts that would defeat the purpose and effect of the Merchant Restraints.   To the contrary, subsequent to March 19, 2008, Visa continued to promulgate and enforce the Merchant Restraints against Plaintiffs and other merchants, and each Visa member bank agreed in writing, and knew that every other member bank agreed in writing, to continue to adhere to and impose the Merchant Restraints on every merchant (including Plaintiffs). Subsequent to March 19, 2008, Visa and its member banks knowingly and intentionally continued to enforce the Merchant Restraints and to receive the anticompetitive benefits, including artificially high Interchange Rates, of their prior conduct and continued to commit acts, including the enforcement of the Merchant Restraints that promoted the purpose and effect of their conspiracy.

70.     Subsequent to March 19, 2008, Visa's member banks, through Visa, collectively agreed to enforce the Merchant Restraints against Plaintiffs and other merchants.   It would be contrary to the independent self-interest of each of Visa's bank members to prevent merchants from discounting Credit Cards which it issues or surcharging Credit Cards issued by its competitors. However, if each member bank knew and understood and tacitly agreed (as they did) that the other member banks would reciprocate by preventing merchants from surcharging that member's Credit Cards, or discounting their own Credit Card, then it would be in the collective economic interest of all the Visa member banks to have Visa set the Interchange Rates at excessively high

supracompetitive levels and to then defend those rates against the forces of competition by agreeing to and actually imposing the Merchant Restraints on every merchant who purchased Visa merchant services.  Subsequent to March 19, 2008, Visa and each of its member banks consciously ascribed to and knowingly participated in a common scheme and understanding that Visa Interchange Rates would be set or remain at supracompetitive levels, and that those excessive price levels would be enforced by the member banks through the continued promulgation and enforcement of the Merchant Restraints.

71.     Accordingly, even if Visa and MasterCard were "two-sided" platforms (and there are good reasons why they are not today and have not been during the Relevant Time Period as alleged above, or an externality is no longer significant and thus a full blown two-sided consideration is not necessary), the Visa and MasterCard conspiracies to set Interchange Rates at supracompetitive levels and impose the Merchant Restraints each constitute horizontal restraints that inhibit competition on a particular level of competition within each platform, *i.e.*, competition to win a greater share of merchants' transaction volume.  Further, Visa's Merchant Restraints and MasterCard's Merchant Restraints each have the anticompetitive effect of eliminating inter-network price competition between and among Visa, MasterCard, American Express, Discover, and even potential new entrants to the Relevant Market.  As such, Visa's Merchant Restraints and MasterCard's Merchant Restraints also adversely affect inter-platform competition among the major credit card networks and potential new entrants.

72.     The restraints on competition alleged in this Complaint are not reasonably related or necessary to the operation of either Visa or MasterCard or their respective networks and, in any event, are more restrictive than necessary to affect any legitimate business goal of either Visa or MasterCard.

**COUNT I**
**Conspiracy in Restraint of Competition Against Visa and Co-conspirators**
**(Regarding Interchange Rates and Merchant Restraints)**

73.      Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

74.      As alleged more fully above, the setting of Interchange Rates and the collective enforcement of those Interchange Rates through Merchant Restraints by Visa and its co-conspirator member banks unreasonably injured competition and eliminated horizontal price competition with respect to Interchange Rates paid by Plaintiffs and other merchants and violated Section 1 of the Sherman Act.

75.      Visa and its co-conspirator member banks entered into and engaged in a continuing combination and conspiracy to fix, raise or maintain the Interchange Fees charged to Plaintiffs and others at an artificially high level that could not be maintained in the absence of their unlawful conduct.

76.      The combination and conspiracy among Visa and its co-conspirators described in the preceding paragraphs consists of a continuing course, practice and pattern of conduct regarding the setting of Interchange Rates charged to Plaintiffs and others.

77.      The substantial terms and purpose of this agreement were to refrain from competing against each other on the setting of Interchange Rates charged to Plaintiffs and others and then to enforce and preserve those Interchange Rates by preventing the merchant from using the price mechanism to drive lower the Interchange Rates to competitive levels.

78.      In order to effect the foregoing illegal combination and conspiracy, Visa and its co-conspirators have engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and exchanging current and future price information about Interchange Rates; (2) agreeing to coordinate, and coordinating, the Interchange Rates they charge to Plaintiffs and

other merchants; and (3) agreeing to impose and then enforce the Merchant Restraints on all merchants.

79.     As part of its unlawful conduct, Visa and its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful conspiracy alleged in this Count.

80.     As a result of Visa's and its co-conspirators' violation of Section 1 of the Sherman Act, and during all times relevant to the allegations in this Count, Interchange Rates have been set and maintained at artificially high and non-competitive levels in the United States, and Plaintiffs and other merchants have been deprived of the benefit of free market forces in the setting of Interchange Rates.

81.     Each Plaintiff has been injured in its business or property in an amount not yet determined by reason of the conspiracy entered into by Visa and its co-conspirator member banks as alleged in this Complaint.  Each Plaintiff's injury is the type of injury that the antitrust laws were designed to prevent and flows from that which makes Visa and its co-conspirators' conduct unlawful.

82.     The setting of the Interchange Rates by Visa and its co-conspirator member banks, in conjunction with the promulgation and enforcement of the Merchant Restraints by Visa's co-conspirators, constitutes a contract, combination or conspiracy in unreasonable restraint of competition.

83.     The conspiracy among Visa and its member banks has had a substantially adverse effect on competition in the GPCC Network Services relevant market and has resulted in higher prices than would exist in the absence of the conspiracy.   In addition, Visa's and its co-conspirators' illegal combination and conspiracy has had anticompetitive effects in the related market for General Purpose Credit Cards as described above.   There are no pro-competitive

justifications for Visa's restraints and, even if there were, (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported pro-competitive justifications.

84.     The conspiracy among Visa and its member banks has had a substantially adverse net effect on competition in the Visa platform relevant market as described above.  There are no pro-competitive justifications for the Merchant Restraints and, even if there were, (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported pro-competitive justifications.

85.     Visa and its co-conspirators have knowingly participated in and taken affirmative steps in furtherance of the conspiracy alleged in this Count.

86.     As a direct and proximate result of the horizontal conspiracy between Visa and its member banks, Interchange Rates have been set at artificially high, supracompetitive levels, and each Plaintiff has suffered injury to its business and property by paying such artificially inflated fees.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Visa's conduct unlawful.

**COUNT II**
**Conspiracy in Restraint of Competition Against MasterCard and Co-conspirators**
<u>**(Regarding Interchange Rates and Merchant Restraints)**</u>

87.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

88.     As alleged more fully above, the setting of Interchange Rates and the collective enforcement of those Interchange Rates through the Merchant Restraints by MasterCard and its co-conspirator member banks unreasonably injured competition and eliminated horizontal price competition with respect to Interchange Rates paid by Plaintiffs and other merchants and violated Section 1 of the Sherman Act.

89.     MasterCard and its co-conspirator member banks entered into and engaged in a continuing combination and conspiracy to fix, raise or maintain the Interchange Rates charged to Plaintiffs and others at an artificially high level that could not be maintained in the absence of their unlawful conduct.

90.     The combination and conspiracy among MasterCard and its co-conspirators described in the preceding paragraphs consists of a continuing course, practice and pattern of conduct regarding the setting of Interchange Rates to Plaintiffs and others.

91.     The substantial terms and purpose of this agreement were to refrain from competing against each other on the setting of Interchange Fees charged to Plaintiffs and other merchants and then to enforce and preserve those Interchange Rates by preventing the merchants from using the price mechanism to drive lower the Interchange Rates to competitive levels.

92.     In order to effect the foregoing illegal combination and conspiracy, MasterCard and its co-conspirators engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and exchanging current and future price information about Interchange Rates; (2) agreeing to coordinate and coordinating the Interchange Rates to be charged to Plaintiffs and other merchants; and (3) agreeing to impose and then enforce the Merchant Restraints on all merchants.

93.     As part of its unlawful conduct, MasterCard and its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful conspiracy alleged in this Count.

94.     As a result of MasterCard's and its co-conspirators' violation of Section 1 of the Sherman Act, and during all times relevant to the allegations in this Count, Interchange Rates have been set and maintained at artificially high and non-competitive levels in the United States, and

Plaintiffs and other merchants have been deprived of the benefit of free market forces in the setting of Interchange Rates.

95.     Each Plaintiff has been injured in its business or property in an amount not yet determined by reason of the conspiracy entered into by MasterCard and its co-conspirator member banks as alleged in this Complaint.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes MasterCard and its co-conspirators' conduct unlawful.

96.     The setting of Interchange Rates by MasterCard and its member banks in conjunction with the group promulgation and enforcement of the Merchant Restraints, constitutes a contract, combination or conspiracy in unreasonable restraint of competition.

97.     The conspiracy among MasterCard and its financial institution members has had a substantially adverse effect on competition in the GPCC Network Services relevant market and has resulted in higher prices than would exist in the absence of the conspiracy.   In addition, MasterCard's and its co-conspirators' illegal combination and conspiracy has had anticompetitive effects in the related market for General Purpose Credit Cards as described above.  There are no pro-competitive justifications for MasterCard's restraints and, even if there were, (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported pro-competitive justifications.

98.     The conspiracy among MasterCard and its member banks has had a substantially adverse net effect on competition in the MasterCard platform relevant market as described above. There are no pro-competitive justifications for the Merchant Restraints and, even if there were, (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported pro-competitive justifications.

99.     MasterCard and its co-conspirators have knowingly participated in and taken affirmative steps in furtherance of the conspiracy alleged in this Count.

100.    As a direct and proximate result of the horizontal conspiracy between MasterCard and its member banks, Interchange Rates have been set at artificially high, supracompetitive levels, and each Plaintiff has suffered injury to its business and property by paying such artificially inflated fees.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes MasterCard's conduct unlawful.

## COUNT III
## Visa's Monopolization

101.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

102.    Visa has monopoly power in the relevant market.

103.    Visa has used its monopoly power to impose on Plaintiffs and other merchants restraints that have the purpose and effect of: (1) excluding competition from and limiting the competitive opportunities of other sellers in the GPCC Network Services relevant market; and (2) maintaining Visa's monopoly power in that market.  These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by Visa make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  In addition, Visa's restraints have had anticompetitive effects in the related market for General Purpose Credit Cards as described above.

104.    Alternatively, Visa has used its monopoly power to impose on Plaintiffs and other Merchants' Restraints that have reduced competition within the Visa Credit Card platform relevant market.  These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by Visa make it difficult or impossible for issuers within the Visa Credit Card platform to

increase the usage of their Visa cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  As a result, Visa has denied Plaintiffs and other merchant users of the Visa Credit Card platform the benefit of price competition for Plaintiffs' Visa transaction volume.  Further, as described above, Visa's restraints have led to anticompetitive effects on cardholder users of the Visa Credit Card platform as well.

105.    As a direct and proximate result of Visa's exclusionary and anticompetitive conduct during the Relevant Time Period, Interchange Fees and Network Fees rose to and remained at artificial, supracompetitive levels.  During the Relevant Time Period, each Plaintiff suffered injury to its business or property by having to pay artificially inflated, supracompetitive Interchange Fees for Network Services.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Visa's conduct unlawful.

## COUNT IV
## MasterCard's Monopolization

106.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

107.    MasterCard has monopoly power in the relevant market.

108.    MasterCard has used its monopoly power to impose on Plaintiffs and other merchants, restraints that have the purpose and effect of: (1) excluding competition from and limiting the competitive opportunities of other sellers in the GPCC Network Services relevant market; and (2) maintaining MasterCard's monopoly power in that market.  These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by MasterCard make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  In addition, MasterCard's restraints have

had anticompetitive effects in the related market for General Purpose Credit Cards as described above.

109.    Alternatively, MasterCard has used its monopoly power to impose on Plaintiffs and other merchants restraints that have reduced competition within the MasterCard Credit Card platform relevant market and have maintained MasterCard's monopoly power in that market. These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by MasterCard make it difficult or impossible for issuers within the MasterCard Credit Card platform to increase the usage of their MasterCard cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  As a result, MasterCard has denied Plaintiffs and other merchant users of the MasterCard Credit Card platform the benefit of price competition for Plaintiffs' MasterCard transaction volume.  Further, as described above, MasterCard's restraints have led to anticompetitive effects on cardholder users of the MasterCard Credit Card platform as well.

110.    As a direct and proximate result of MasterCard's exclusionary conduct during the Relevant Time Period, Interchange Fees and Network Fees rose to and remained at artificial, supracompetitive levels.  During the Relevant Time Period, each Plaintiff suffered injury to its business or property by having to pay artificially inflated, supracompetitive Interchange Fees for Network Services.  Each Plaintiff's injury is the types of injury the antitrust laws were designed to prevent and flows from that which makes MasterCard's conduct unlawful.

### COUNT V
### Attempted Monopolization By Visa

111.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

112.    Visa's anticompetitive conduct as alleged in this Complaint created a dangerous probability that Visa would achieve monopoly power in the relevant market.

113.     Visa had a specific intent to achieve monopoly power in the relevant market.

114.     Visa used its market power to impose restraints on Plaintiffs and other merchants, the purpose and effect of which was to: (1) exclude competition from and limit competitive opportunities of other sellers in the GPCC Network Services relevant market; and (2) give Visa a dangerous probability of obtaining monopoly power in that market.   These restraints and restrictions included, but are not limited to, the Merchant Restraints.   The restraints and restrictions imposed by Visa made it difficult or impossible for other card networks and providers to enter the relevant market or to increase the usage of their cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants like Plaintiffs.   In addition, Visa's restraints have had anticompetitive effects in the related market for General Purpose Credit Cards as described above.

115.     Alternatively, Visa has used its market power to impose on Plaintiffs and other merchants restraints that have reduced competition within the Visa Credit Card platform relevant market and have given Visa a dangerous probability of obtaining monopoly power in that market. These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by Visa make it difficult or impossible for issuers within the Visa Credit Card platform to increase the usage of their Visa cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  As a result, Visa has denied Plaintiffs and other merchant users of the Visa Credit Card platform the benefit of price competition for Plaintiffs' Visa transaction volume.  Further, as described above, Visa's restraints have led to anticompetitive effects on cardholder users of the Visa Credit Card platform as well.

116.     As a direct and proximate result of Visa's exclusionary conduct, Interchange Rates have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business and property by having to pay such artificially inflated, supracompetitive

Interchange Rates and Network Fees for Network Services.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

**COUNT VI**
**Attempted Monopolization By MasterCard**

117.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 72 above.

118.    MasterCard's anticompetitive conduct as alleged in this Complaint created a dangerous probability that MasterCard would achieve monopoly power in the relevant market.

119.    MasterCard had a specific intent to achieve monopoly power in the relevant market.

120.    MasterCard used its market power to impose restraints on Plaintiffs and other merchants, the purpose and effect of which was to: (1) exclude competition from and limit competitive opportunities of other sellers in the GPCC Network Services relevant market; and (2) give MasterCard a dangerous probability of obtaining monopoly power in that market.  These restraints and restrictions included, but are not limited to, the Merchant Restraints.  The restraints and restrictions imposed by MasterCard made it difficult or impossible for other card networks and providers to enter the relevant market or to increase the usage of their cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants like Plaintiffs.  In addition, MasterCard's restraints have had anticompetitive effects in the related market for General Purpose Credit Cards as described above.

121.    Alternatively, MasterCard has used its market power to impose on Plaintiffs and other merchants restraints that have reduced competition within the MasterCard Credit Card platform relevant market and have given a dangerous probability of obtaining monopoly power in that market.  These restraints include, but are not limited to, the Merchant Restraints.  The restraints imposed by MasterCard make it difficult or impossible for issuers within the MasterCard

Credit Card platform to increase the usage of their MasterCard cards by offering lower Interchange Rates, lower Network Fees, or other attractive terms to merchants, including Plaintiffs.  As a result, MasterCard has denied Plaintiffs and other merchant users of the MasterCard Credit Card platform the benefit of price competition for Plaintiffs' MasterCard transaction volume.  Further, as described above, MasterCard's restraints have led to anticompetitive effects on cardholder users of the MasterCard Credit Card platform as well.

122.    As a direct and proximate result of MasterCard's exclusionary conduct, Interchange Rates have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business and property by having to pay such artificially inflated, supracompetitive Interchange Rates and Network Fees for Network Services.  Each Plaintiff's injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants and request that the Court:

A.    Declare that Defendants have violated the United States antitrust laws in each of the ways alleged above;

B.    Order each Defendant to pay Plaintiffs three times the damages caused by that Defendant and its co-conspirators and sustained by Plaintiffs from January 1, 2004 to the present;

C.    Order Defendants to pay Plaintiffs the costs of this suit, including their reasonable attorneys' fees; and

D.    Order such other and further relief as the Court deems just and proper.

## XIII.  JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

48

Dated:  May 19, 2017

KENNY NACHWALTER, P.A.

By: _____

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Robert D. W. Landon, III, Esquire
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:    (305) 373-1000
Fax:   (305) 372-1861
E-mail:   rarnold@knpa.com
            wblechman@knpa.com
            rlandon@knpa.com

***Counsel  for  Plaintiffs  The  Hertz
Corporation, Herc Rentals Inc. and
Royal Caribbean Cruises Ltd.***

560664.1